## A97A1462. CRAVEY v. JOHNSON.
### (493 SE2d 536)

MCMURRAY, Presiding Judge.

Larry Eugene Cravey seeks to avoid a release he and his spouse executed in favor of Georgia Farm Bureau Mutual Insurance Company's ("Farm Bureau") deceased insured, James Emory Sheppard. Cravey contended that a Farm Bureau agent (claims adjuster) duped him into signing the release in exchange for $15,000 by misrepresenting facts relevant to Cravey's own insurance coverage at a time when Cravey was bed-ridden, under the influence of pain medication and recovering from severe head and body injuries sustained during a head-on automobile collision with Sheppard. The trial court granted summary judgment in favor of Sheppard's estate finding that Cravey was not mentally incapacitated when he signed the release and that Cravey had no right to rely on the representations of Farm Bureau's claims adjuster. We reverse because genuine issues of material fact remain as to whether the release is voidable based on alleged material misrepresentations by Farm Bureau's claims adjuster during a time when Cravey's capacity was diminished.

Cravey filed his affidavit in opposition to Sheppard's estate's motion for summary judgment. He pertinently deposed as follows: "My name is Larry Eugene Cravey, and . . . . I am 32 years old. . . . On May 31, 1990, I was involved in an automobile collision which occurred on Ga. Hwy. 31 approximately .7 of a mile south of the city limits of McRae, Georgia. At that time, a vehicle driven by James Emory Sheppard crossed the center line of the roadway, entered my lane of travel and collided with my vehicle. At the time of the collision, I was insured under a policy of insurance issued by Southern Trust Insurance Company [("Southern Trust") providing] uninsured motorist coverage in the amount of $50,000.00. . . .

"The vehicle driven by Mr. Sheppard was insured by Georgia Farm Bureau Mutual Insurance Company. The week following the

accident I was contacted by Jim Norris, an adjuster employed by Georgia Farm Bureau. He told me that he wanted to go ahead and pay the coverage under Mr. Sheppard's policy of insurance because he considered it to be a case of clear liability and that Mr. Sheppard was responsible for my injuries. I was seriously injured in the accident and was hospitalized for five days immediately following the accident. I sustained the following injuries: both bones in my left lower forearm were shattered and required surgery and the installation of metal plates to hold them together, my teeth and upper jaw were severely injured and required surgery to repair facial bones and I now wear a partial plate for five teeth. When I was discharged from the hospital on June 4, 1990, I was confined to a hospital bed at home. Because both of my knees were injured in addition to my arm and mouth injuries, I could not get out of bed. Also, because of the injuries to my mouth and teeth, I could not speak very well. I was swollen and bruised all over, especially in my chest. I was in a lot of pain and took pain medication approximately every two or three hours. Further, I was out of work for six months at which time I returned to only occasional work. I worked in a family owned business and therefore could arrange convenient hours. However, it was almost a year before I returned to regular full-time employment. My medical expenses for all of the surgeries and medical treatment total over $28,000.00. Further, I anticipate having to have further medical treatment for my injuries.

"The accident occurred on Thursday, May 31, 1990 and I remained in the hospital, the Medical Center of Central Georgia, in Macon, for five days and was discharged on or about June 4, 1990. I first spoke with Mr. Norris on just one or two days after I got home to McRae[, Georgia]. At that time, I was on pain medication. In my conversation with Mr. Norris he told me that he would talk to my insurance agent and then get back in touch with me. Mr. Norris told me that all the coverage Farm Bureau had was $15,000.00. He also told me that because Mr. Sheppard had been killed in the accident, there was no one that I could sue.

"A day or so later Mr. Norris got back in touch with me at my home. At that time I was still on pain medication. Mr. Norris reiterated to me what he had previously told me about coverage and that he talked with my insurance agent. He told me there was no more coverage and that I might as well take the $15,000.00. In reliance upon Mr. Norris' representation, I signed the release and took the money.

"Several months after the accident, I started getting notices from the doctors and hospitals that my bills were unpaid because my insurance benefits were exhausted. I called Southern Trust and spoke with a lady named Jill Selph. I told her that I did not think my

coverage was exhausted and that I should have uninsured motorist coverage sufficient to pay any outstanding medical bills. Initially, Ms. Selph told me that I was wrong and that my coverage was exhausted. When I told her that could not be right, she indicated that she would check with her supervisor and get back with me. She called back and told me that I did in fact have uninsured motorist coverage of $50,000.00.

"A few days after that conversation, I received a letter from Southern Trust asking for certain information. I provided that information and ultimately received a letter from Southern Trust indicating that they were denying any claims under the uninsured motorist coverage." *Held*:

A claims adjuster, even absent a fiduciary relationship, may not induce a claimant by trick, artifice or misrepresentations to sign a general release while the claimant is under a disability which deprives him of the capacity to read, reason or investigate for himself. See *Mallard v. Jenkins*, 179 Ga. App. 582, 583 (347 SE2d 339). This rule is consistent with OCGA § 33-6-3's ban against unfair or deceptive acts or practices in the business of insurance and is in harmony with OCGA § 51-1-35 (a)'s provision that no person whose interest may become adverse to an injured person may, for 15 days from the date of the occurrence causing the injury, negotiate or attempt settlement of a matter with an injured party who is confined to a health care facility.

In the case sub judice, there is not only proof that Farm Bureau's claims adjuster persuaded the Craveys to sign a general release eight days after Mr. Cravey sustained serious head and body injuries and while Mr. Cravey was under the influence of mind-dulling drugs, there is evidence that this claims adjuster may have purposely misled the Craveys about his investigation into the extent of Mr. Cravey's coverage and then inaccurately informed Mr. Cravey that he had no further insurance coverage — a representation relating to a subject outside the terms of the release but within Mr. Cravey's alleged reasons for executing the release. Under such circumstances, we find that genuine issues of material fact remain as to whether Mr. Cravey may avoid the release based on the alleged practices and utterances by Farm Bureau's claims adjuster in violation of the ban mandated in OCGA § 33-6-3. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474). Compare *Fincher v. Dempsey*, 209 Ga. App. 222 (433 SE2d 78), and *McCoy v. State Farm Ins. Cos.*, 199 Ga. App. 675 (405 SE2d 743), where there was no proof that the insurers' agents prevented the claimants from reading releases which would have disclosed the agents' alleged duplicity.

The trial court erred in granting Sheppard's estate's motion for summary judgment.

*Judgment reversed. Beasley, Ruffin and Eldridge, JJ., concur. Andrews, C. J., Birdsong, P. J., and Smith, J., dissent.*

SMITH, Judge, dissenting.

I respectfully dissent. In my view, Cravey's amended complaint and affidavit submitted in opposition to Johnson's motion for summary judgment did not raise genuine issues of material fact.

1. With regard to Cravey's claim that he was mentally incompetent to execute the release, this Court should recognize and apply the rule that "every man is presumed to have all his mental faculties and to be of normal and ordinary intelligence, and where it is contended that one who executed a contract was not competent to execute it, the burden is upon him who asserts the incompetency. Mental or physical impairment is never presumed. It must be proved. In order to void a contract on the ground of mental incapacity of the maker, he must have been *non compos mentis*, that is, entirely without understanding, at the time the contract was executed. It is also the policy of Georgia law, wherever possible, to uphold contracts and to uphold the capacity of one to enter into a contract." (Citations and punctuation omitted.) *Nelson v. State Farm Life Ins. Co.*, 178 Ga. App. 670, 672 (1) (344 SE2d 492) (1986).

It is true that Cravey claimed in his amended complaint that he was mentally incompetent to execute the release because he was under the influence of medication at the time he executed it. But this contention is belied by other allegations. Cravey contended in the amended complaint that his intent at the time he executed the release was only to release claims against liability coverage afforded by Georgia Farm Bureau on behalf of its insured, the driver of the other vehicle in the collision. He also claimed, however, that he did not intend to release any claims to the extent that they were covered by uninsured motorist benefits under a policy issued to him by Southern Trust. It is disingenuous to argue that Cravey was competent to execute the release insofar as it affected Farm Bureau's coverage but incompetent to execute it inasmuch as it affected other coverage. Cravey's allegation of incompetence simply does not satisfy his burden of showing that he "was entirely without understanding at the time the contract was executed." (Citation and punctuation omitted.) *Nelson*, supra at 672. While Cravey may have been mistaken as to the effect of the release, mistake is not equivalent to incompetency.

Cravey's affidavit testimony also failed to show that he was mentally incompetent to sign the release. While it recited that Cravey suffered significant injuries to his knees, face, and one arm, that he took pain medication approximately every two or three hours, and that he was on that medication when he signed the release, this evidence alone does not show that he was unable to read and under-

stand the release under the standard of *Nelson*, supra, when he signed it. It shows merely that Cravey was taking pain medication. This case is factually distinguished from *Mallard v. Jenkins*, 179 Ga. App. 582 (347 SE2d 339) (1986), cited by the majority. In *Mallard*, plaintiff was in pain and under the effects of pain medication when she signed a release. But she also swore that she was semi-literate and could not read with any proficiency. Id. at 583. And while we concluded that the medication affected her ability to reason, we based our reversal of the trial court's grant of summary judgment to defendants primarily on the "even clearer reason" that a jury issue was presented as to whether plaintiff could have read and understood the release "even had she not been under any other disability." Id. *Mallard* is inapt because, unlike the plaintiff in that case, Cravey has not claimed that he suffered from "a disability which deprived him of the capacity to read or reason." (Emphasis omitted). Id. See also *McCoy v. State Farm Ins. Cos.*, 199 Ga. App. 675 (405 SE2d 743) (1991).

Contrary to Cravey's argument, reversal is also unwarranted under *Wheat v. Montgomery*, 130 Ga. App. 202, 205-206 (7) (202 SE2d 664) (1973). In that case, plaintiff signed a release but raised the issue of her incompetency in opposition to summary judgment. She swore, among other things, that she was unable "to think clearly." Id. at 205. This Court reversed the trial court's grant of summary judgment to defendant. We stated that once she raised the issue, defendant bore the burden of rebutting her allegation that she was not competent. Apparently defendant failed in this regard. But here, the record — including Cravey's own pleadings — rebuts his claim of incompetence by revealing his ability to reason at the time he signed the release. Cravey's reliance on *Wheat* is consequently misplaced.

2. The documents submitted by Cravey also do not show that the adjuster's alleged statements amounted to actionable misrepresentation. "[N]o fiduciary relationship exists between one having a claim against an insured and the agent of a liability carrier who seeks settlement of the claim, and a release obtained by him from a party having a claim for damages is binding, even if the statements and representations made by him relative to liability or non-liability for the damages were incorrect or based upon erroneous reasons, unless he has prevented the claimant from making investigation of his legal rights. [Cits.]" *Conklin v. Liberty Mut. Ins. Co.*, 240 Ga. 58, 60 (239 SE2d 381) (1977). Here, as in *Conklin*, even assuming the adjuster made the alleged statements to Cravey, the record does not show that he engaged in any "artifice, trick or actual fraud . . . that would avoid the release." Id. Cravey had no reasonable basis to rely upon the alleged representation of another's insurer, especially when Cravey could himself have determined the extent of his own coverage

through the simplest of measures — a telephone call to his own insurer. The law is clear that a person cannot claim fraud "about a matter equally open to the observation of all parties where no special relation of trust or confidence exists. [Cits.]" *Hubert v. Beale Roofing*, 158 Ga. App. 145, 146 (279 SE2d 336) (1981).

Cravey's argument that a fiduciary relationship was created by the adjuster's statements that he would — and did — talk with Cravey's own insurance agent is unavailing. *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588 (322 SE2d 269) (1984), relied upon by Cravey, does not support this argument. That case addresses the issue of personal injury damages to a third party when an insurance company undertakes to make and negligently performs a safety inspection on which the third party was entitled to rely. The issues in this case are wholly unrelated to such a pre-accident inspection but instead focus on representations concerning coverage made with regard to a post-accident claim.

Because Cravey failed to show that he was legally incompetent when he signed the release or that the adjuster made material misrepresentations amounting to fraud, I would affirm the trial court's grant of summary judgment.

I am authorized to state that Chief Judge Andrews and Presiding Judge Birdsong join in this dissent.

DECIDED OCTOBER 10, 1997 —
RECONSIDERATION DENIED NOVEMBER 4, 1997 — 

*Newton, Smith, Durden, Kaufold & Rice, Wilson R. Smith*, for appellant.

*Groover & Childs, Frank H. Childs, Jr., McNatt, Greene & Thompson, Hugh B. McNatt, Troy L. Greene*, for appellee.